FAIRVIEW ENTERPRISES, INC., and Donald A. Witt, Esq., Respondents,

v.

CITY OF KANSAS CITY, Missouri, Danny R. Stamper, Verena Stamper, W. Danny Stamper, Rhonda Stamper, and Bowen Construction Company, Appellants.

Nos. WD 58947, WD 58952.

Missouri Court of Appeals, Western District.

Aug. 28, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Oct. 30, 2001.

Application for Transfer Denied Dec. 18, 2001.

Lana K. Torczon, Kansas City, for appellant City of Kansas City.

Cathy J. Pitman Dean, for appellants Stamper and Bowen Construction Company.

Sherwin L. Epstein, Kansas City, for respondents Fairview Enterprises, Inc., and Donald Witt.

Before THOMAS H. NEWTON, Presiding Judge, JOSEPH M. ELLIS and RONALD R. HOLLIGER, Judges.

JOSEPH M. ELLIS, Judge.

Appellants Danny R. Stamper, Verena Stamper, W. Danny Stamper, Rhonda Stamper,[1] and Bowen Construction Company ("Bowen Construction") appeal from a declaratory judgment entered in the Circuit Court of Platte County declaring Missouri Zoning Ordinance No. 981321 of the City of Kansas City, which would have allowed Bowen Construction to operate an asphalt plant on a rezoned 8.5–acre lot, null and void. Appellant City of Kansas City ("the City") also appeals that judgment.

All of the property relevant to this case falls within the Kansas City International Airport Plan ("KCIA plan"). Property falling within the area covered by that plan is subject to different zoning designations (GP–1 through GP–8) than the rest of the city and approval of site plans is required for construction on property within the KCIA plan.

The Stampers own significant amounts of land northwest of Kansas City International Airport. Some of that land is within the Kansas City limits, and some is not. The Stampers have long leased portions of their land to Hunt Midwest to operate a quarry. Within the quarry, Hunt Midwest utilizes a rock-crusher.

In 1994, the Stampers agreed to allow Bowen Construction to lease a 3.8–acre piece of land just outside the Kansas City limits for the operation of an asphalt plant.

---

1. These individuals will be collectively referred to as "the Stampers" throughout this opinion.

The chosen location was next to the Hunt Midwest rock-crusher and the quarry operations near the intersection of Interurban Road and 144th Street.[2] The leased property was near the Stampers' home.

After the County refused to rezone the land to allow the operation of the asphalt plant, the Stampers and Bowen Construction petitioned the City to annex the land and to rezone the 3.8 acres to allow for the operation of an asphalt plant. Subsequently, the City annexed the 3.8 acres and designated it as a GP–1 (General Industry) zone and approved the use of the property for an asphalt plant. Bowen Construction then erected an asphalt plant on that site.

Thereafter, the Stampers acquired an additional 255–acre tract of land that had bordered their property on the southwest side. That property was zoned GP–7 (Agricultural and Low Density Residential). The property was bordered to the north by land owned by Respondent Donald Witt. Respondent Fairview Enterprises owned property immediately to the southwest of the Stampers' new land.

In 1998, Hunt Midwest expanded its quarrying operation onto this newly acquired 255–acre tract. In conjunction with that expansion, Hunt Midwest decided to relocate the rock-crusher to the southwest approximately one mile, near the northeast corner of the Stampers' new property and the southeast corner of the Witt property. With Hunt Midwest planning to relocate the rock-crusher, the Stampers agreed to lease Bowen Construction 8.5 acres of land along the northern border of the 255 acres so that Bowen Construction could relocate its asphalt plant to be next to the rock-crusher. This land included a 2,168 foot-long driveway that would be 30 feet wide ending in a 700–foot by 350–foot lot on which the asphalt plant would be located. The entrance to the driveway would be located on N. Winan Road.

On June 12, 1998, Bowen Construction filed a zoning application seeking to rezone the 8.5 acre tract from GP–7 (Agriculture and Low Density Housing) to GP–1 (General Industry) and to be granted permission to operate its asphalt plant on that site. Bowen Construction also filed an application to have the 3.8–acre tract on which the asphalt plant was then situated rezoned from GP–1 back to GP–7.

On July 21, 1998, a planner with the City Planning and Development Department staff, Carrie L. Flack, submitted a report recommending approval of the rezoning requested by Bowen Construction. The matter then went to the City Planning Commission.

At the hearing before the City Planning Commission, Ms. Flack's report was submitted, and Respondents presented evidence in opposition to the proposed rezoning. Following the hearing, the City Planning Commission voted to recommend denial of the rezoning application.

Despite the City Planning Commission's recommendation that the rezoning of the 8.5–acre lot be denied, a member of the City Council shortly thereafter introduced Ordinance No. 981321 ("the Ordinance") which would rezone the property as GP–1 and approve the site plan for the asphalt plant. The Ordinance was then referred to the Planning, Zoning and Economic Development Committee of the City Council. That committee conducted hearings on the proposed Ordinance on December 16 and 21, 1998. Respondents and other neighbors presented evidence in opposition to the proposed rezoning. Thereafter, the committee recommended approval of the ordinance after adding an additional provi-

2. 144th Street turns into Highway 92 near the plant.

sion requiring Bowen Construction to widen and strengthen N. Winan Road from the driveway south for one mile to the "north access road." On December 29, 1998, the City Council voted to pass the Ordinance.

On February 3, 1998, Respondents filed a petition in the Circuit Court of Platte County requesting declaratory relief. The case was tried to the court on May 24 and 25, 2000.

On July 14, 2000, the trial court entered its judgment declaring the Ordinance null and void. The trial court found that the public welfare was not served by the rezoning of the 8.5–acre plot and that the actions of the City Council in enacting the Ordinance were arbitrary and capricious, unreasonable and not fairly debatable. The court found that the enactment of the Ordinance had no substantial relationship to the public health, safety and welfare of the city or its inhabitants and constituted an improper exercise of police powers by the city council. The court also held that, even if the rezoning of the property to GP–1 had been proper, the operation of an asphalt plant was not a use permitted in a GP–1 district under the statutory language creating GP–1 districts. Appellants bring two points on appeal.

In their first point, Appellants claim the trial court erred in finding that that rezoning of the 8.5–acre plot to GP–1 was unreasonable, arbitrary and capricious. They argue that Respondents failed to present evidence to overcome the presumed validity of the statute. Appellants further contend that under the evidence in the record the reasonableness of the decision to allow the asphalt plant to be relocated was fairly debatable.

■■■ "Missouri courts have long held that our state's Zoning Enabling Act, Sections 89.010 through 89.140 RSMo, is the sole source of power and measure of authority for cities, towns and villages in zoning matters." *City of Louisiana v. Branham,* 969 S.W.2d 332, 336 (Mo.App. E.D.1998). The Zoning Enabling Act authorizes cities and counties to impose zoning regulations "for the purpose of promoting health, safety, morals, comfort or general welfare." *State ex rel. Helujon, Ltd. v. Jefferson County,* 964 S.W.2d 531, 540 (Mo.App. E.D.1998) (citing § 64.850, RSMo 1994).

■■■ "Since zoning and refusal to rezone are legislative acts, we review *de novo* any challenges to their validity, with deference to the trial court's ability to assess the credibility of witnesses." *Lenette Realty & Inv. Co. v. City of Chesterfield,* 35 S.W.3d 399, 405 (Mo.App. E.D. 2000). In reviewing the Ordinance at issue, we follow the standard of review set forth in *Heidrich v. City of Lee's Summit,* 916 S.W.2d 242, 248–49 (Mo.App. W.D. 1995):

[T]he exercise of zoning power is a legislative rather than quasi-judicial function. . . . Upon review, this Court may reverse a legislative action "only if arbitrary and unreasonable, meaning that the decision is not 'fairly debatable.' " *Summit Ridge Dev. Co. v. Independence,* 821 S.W.2d 516, 519 (Mo.App. 1991) (citations omitted): A decision is considered arbitrary and unreasonable if it bears no substantial relationship to the public health, safety, morals, or general welfare. *State ex rel. Barber & Sons Tobacco Co. v. Jackson County,* 869 S.W.2d 113, 117 (Mo.App.1993). If "the public welfare is not served by the zoning or if the public interest served by the zoning is greatly outweighed by the detriment to private interests, the zoning is arbitrary and unreasonable . . ." *Despotis v. Sunset Hills,* 619 S.W.2d

814, 820 (Mo.App.1981). In making this determination, this Court considers:

> the adaptability of the subject property to its zoned use and the effect of zoning on property value in assessing private detriment. The character of the neighborhood, the zoning and uses of nearby property, and the detrimental effect that a change in zoning would have on other property in the area are relevant to the determination of public benefit.

State ex rel. Barber & Sons Tobacco Co., 869 S.W.2d at 117. Zoning ordinances are presumed valid and "any uncertainty about the reasonableness of a zoning regulation must be resolved in the government's favor." Id.

■ Accordingly, a two-step analysis must be conducted when determining the validity of a zoning provision. Lenette Realty & Inv. Co., 35 S.W.3d at 405. "First, the court determines whether the challenging party has presented sufficient evidence to rebut the presumption that the present zoning is reasonable. Then, if the presumption has been rebutted, the court determines whether the government's evidence establishes that the reasonableness of the zoning is 'fairly debatable.'" Id. at 405–06.

■ We first examine whether respondents presented sufficient evidence that the detriment to their property resulting from usage of the 8.5 acres for an asphalt plant outweighs the benefit of relocating the plant to the general public. "Neighboring land owners who have relied on the existing zoning classifications of a parcel proposed for rezoning ... have an interest in the perpetuation of such scheme unless a change is compelled by the public good." State ex rel. Barber &

Sons Tobacco Co. v. Jackson County, 869 S.W.2d 113, 120 (Mo.App. W.D.1993).

Appellants argue that Respondents did not present evidence at trial that the GP–1 zoning or the asphalt plant would adversely affect the use and value of their properties. Appellants also contend that Respondents failed to present any evidence that the noise, smoke, odor and traffic from the asphalt plant would have a detrimental impact on the use and value of the land surrounding the asphalt plant. The record does not support these contentions.

■ Donald Witt testified that the neighborhood around the 8.5–acre lot, aside from the quarry, was residential and agricultural. He noted that the property to his east and to his west was zoned GP–7 for low-density residential and agricultural use and that there were about one dozen subdivisions within a mile of the 8.5–acre lot. Mr. Witt stated that "the asphalt plant is a smokestack industry" that would be right on his southern property line and would be very visible from his property. Mr. Witt testified that the smoke and noise coming from the asphalt plant would negatively impact on his property and that the additional noise and traffic resulting from the volume of trucks would also negatively impact on the property value. He said that the asphalt plant would have a detrimental effect on his property and the surrounding properties and that the use of the land for an asphalt plant would be inconsistent with the residential and agricultural property use in the neighborhood. Mr. Witt testified that, prior to the rezoning of the 8.5–acre lot to allow the operation of an asphalt plant along his southern border, his property was worth $350,000. He testified that the asphalt plant would destroy any chance of using the land for residential use and that the rezoning would cause the value of his property to decrease to

$60,000.[3]

Richard Spencer, whose family owns 708 acres of land immediately south of the 255–acre tract acquired by the Stampers, testified that his land was zoned for agricultural use and was used in that manner. He testified that the asphalt plant would be located a half mile north of his property. Mr. Spencer testified that his family's property was zoned GP–7 (Agricultural and Low Density Residential) and that the surrounding properties, including the Stamper property, were likewise zoned GP–7 (Agricultural and Low Density Residential). He further testified that the unsightly nature of the asphalt plant, the truck traffic associated with the asphalt plant, and emissions from the asphalt plant would negatively impact on the value of his property.

James Reed, a Chartered Financial Analyst,[4] testified on behalf of his family's business, Fairview Enterprises, for whom he served as corporate secretary. Mr. Reed testified that Fairview Enterprises owned the land to the southwest of the Stampers' 255 acres. He indicated that this land was being used for agriculture and light residential use. Mr. Reed testified that the neighborhood around the 8.5 acres was primarily agricultural with scattered houses and some sub-divisions. Mr. Reed testified that the placement of an asphalt plant on the 8.5 acres would significantly damage the property value of Fairview Enterprises' property. He stated that odor from the plant would negatively impact on nearby property and that the volume of asphalt truck traffic flowing through the country roads would detrimentally affect the property values in the area. Mr. Reed also testified that the use of the 8.5 acres for an asphalt plant was not compatible with the use being put to the other property in the area

Mr. Reed further testified that the truck traffic generated by the asphalt plant on Winan Road would detrimentally effect the properties in the neighborhood. Appellants admitted during discovery that the hours of operation for the asphalt plant would be from 6 a.m. to 6 p.m. Monday through Saturday and occasionally Sunday and that 75 to 150 asphalt trucks would be entering and leaving the asphalt plant daily. Mr. Reed noted that Winan Road was a two-lane country road with no curbs, gutters, sidewalks, or centerline. He testified that the emission, asphalt smell, and dust generated by these trucks would have a negative impact on the area.

Larry Witt, a professional real estate appraiser and consultant, testified on behalf of Respondents.[5] Mr. Witt testified that, aside from the quarry, the area surrounding the 8.5 acres was basically agricultural. Mr. Witt stated that the asphalt plant would be an intensive use that would generate increased traffic, noise, fumes and other problems that would have a negative impact on the neighborhood, devaluing the surrounding properties. He indicated that the unattractive appearance of the asphalt plant would also negatively impact on the surrounding property. Mr. Witt testified that the placement of an asphalt plant on the 8.5 acres would cause a decrease in the value of the surrounding properties.

With regard to the truck traffic generated by the asphalt plant, Mr. Larry Witt

3. "Missouri courts have always allowed evidence of disparity in value in determining whether there is a private detriment." *Lenette Realty & Inv. Co. v. City of Chesterfield,* 35 S.W.3d 399, 406 (Mo.App. E.D.2000).

4. Mr. Reed testified that he had studied real estate valuation as part of this certification.

5. Larry Witt testified that he is not related to Appellant Donald Witt.

testified that Winan Road is a two-lane paved road, of rural residential character, that is currently rated to hold vehicles up to 12 tons and with a total pavement width of 22 to 24 feet. He testified that NW 132nd Street was a two-lane asphalt road slightly narrower than Winan Road with a posted weight limit of 5 tons. Mr. Witt stated that in Missouri asphalt trucks could weigh as much as 50 tons when loaded and that the area roads could not handle the truck traffic. Mr. Witt testified that the farmers in the area used these roads to move farm equipment including tractors, harvesting combines, and large disc plows and that this slow-moving equipment could be as wide as 15 to 16 feet.

John Coffey, a farmer along Winan Road, testified that he moves farm machinery up and down Winan Road that is up to twenty feet wide. He testified that with the kind of traffic the asphalt plant would produce he would not be able to move his machinery. He further stated that he was sure that the combination of farm machinery and asphalt trucks would cause accidents.

Dr. Eric Strauss, Ph.D., an urban planner and expert on land use planning, testified that the rezoning of the 8.5 acres was improper "spot zoning."[6] He stated that the city had zoned a parcel of land surrounded by incompatible land use for the benefit of a single owner and without any community benefit. He further testified that placing the asphalt plant next to the quarry and rock crusher represented a crowding of land uses. Dr. Strauss also stated that an asphalt plant was a use that devalues everything around it and that asphalt plants create problems with odor, noise, smoke and traffic. Dr. Strauss tes-

tified that the asphalt trucks would cause traffic problems and that their weight would exceed the limits for area roads. He stated that Winan Road had a twelve-ton weight limit and that 132nd Street had a five-ton weight limit and that loaded asphalt trucks weighed fifty tons. Finally, Dr. Strauss testified that he could perceive no public benefit to allowing this asphalt plant to be relocated and that the only purpose he could see for the proposed relocation was for the economic benefit of Bowen Construction.

In sum, the evidence submitted by Respondents at trial was more than sufficient to establish a detriment to their property. Respondents presented evidence that the smoke, odor and traffic associated with the asphalt plant would negatively affect the use and enjoyment of their land and that it would significantly lower the value of their property.

Respondents likewise presented sufficient evidence to establish that their private detriment outweighed the benefit to the public good. "Factors relevant to the determination of a public benefit include the character of the neighborhood, the zoning and uses of nearby property and the effect that a change in zoning would have on other property in the area." *White v. City of Brentwood*, 799 S.W.2d 890, 894 (Mo.App. E.D.1990).

■ The evidence presented by Respondents in establishing the private detriment to their property also tends to establish that there would be little to no public benefit from the zoning change under the factors stated in *White*. The property surrounding the 8.5 acre tract was zoned for agricultural and light residential use. While there was some evidence suggesting

**6.** Dr. Strauss also testified that the rezoning of the 8.5 acres created a "flag lot" which is considered a bad planning practice.

that the use of the property for an asphalt plant might be consistent with the quarry operations, there was extensive testimony that the smoke, odor, and unsightliness of the asphalt plant along with the traffic generated by it would negatively affect the use of the surrounding property for agricultural and residential purposes. The testimony also clearly established that the use of the site for an asphalt factory would reduce the value of the surrounding properties. Accordingly, the factors set forth for consideration in *White* appear to indicate a public detriment rather than a public benefit to allowing the asphalt plant to relocate. Respondents presented sufficient evidence that the private detriment to their property outweighed any public benefit to allowing the asphalt plant to be rezoned and thereby rebutted the presumption that the Ordinance was valid.

 Having determined that Respondents presented sufficient evidence to rebut the presumption that the zoning was reasonable, we next examine whether the reasonableness of allowing the asphalt plant to relocate was "fairly debatable." *Lenette Realty & Inv. Co. v. City of Chesterfield*, 35 S.W.3d at 406. "If the government can offer no evidence that the current zoning serves a valid public interest, there is no debatable issue." *Id.* at 408. Accordingly, we will next consider the evidence presented by Appellants at trial.

Carrie Flack, the city planner assigned to evaluate the zoning request, testified that it was solely her responsibility to make a recommendation on the project to the City Planning Commission. In her report, Ms. Flack recommended rezoning the 8.5 acres and allowing the asphalt plant to be relocated. Her report stated:

> The proposed development is consistent with the proposed rezoning and the approved area plan. In addition, the asphalt plant is associated with the existing quarry which is consistent with the existing zoning in this area. Staff believes that the relocation of the asphalt plant will not have a detrimental impact on the surrounding area.

This was the sum of her analysis.

At trial, while Ms. Flack testified that she did not think the asphalt plant would have a detrimental effect on the surrounding property, she also testified that she made no determinations related to smoke, fumes, or odor in making her evaluation. Ms. Flack testified that she did not consider any health issues in making her zoning recommendation. She stated that she only saw the existing asphalt plant from the road and never went to examine it and that she did not think it was important to know how an asphalt plant makes asphalt in order to make her zoning recommendation. Ms. Flack testified that she never visited adjacent properties to determine how visible the asphalt plant would be and that she never spoke with any of the landowners in the area. She acknowledged that there was no traffic study done by the city and that the applicants did not submit such a study.[7] When asked if she was concerned about the use of agricultural land being affected by the asphalt plant, Ms. Flack responded that she felt the asphalt plant was in conformance and in harmony with the quarry and that quarries were allowed on agricultural land.

---

7. Ms. Flack indicated she did not know anything about the nature of the truck traffic that would be associated with the asphalt plant, but stated that she had spoken with the city transportation department and they did not feel the amount of traffic that would likely be generated by this development would cause any type of traffic concerns worthy of reviewing. Ms. Flack also testified that she believed the asphalt trucks could drive on any public road.

She stated that in making her recommendation she was not concerned in any way with whether the asphalt plant would negatively impact on the value of properties in the area because she did not consider that to be part of her review. Thus, according to her testimony, Ms. Flack did not consider any of the relevant issues related to the public health, safety, morals or general welfare or any detrimental effect the asphalt plant would have on surrounding property values in rendering her opinion. The trial court clearly found Ms. Flack's testimony that there would not be a detrimental impact on the surrounding properties was not credible, and we give deference to the trial court's assessment. *Lenette Realty & Inv. Co.*, 35 S.W.3d at 405; *St. Louis County v. Kienzle*, 844 S.W.2d 118, 122 (Mo.App. E.D.1992).

Matthew Bowen testified on behalf of Bowen Construction. When asked what advantages there would be to the community to move the asphalt plant, Mr. Bowen testified that Bowen Construction wanted the asphalt plant near the rock crusher to save the company money and make them more competitive because they are charged by the distance for rock hauling. When asked if allowing the asphalt plant to relocate would benefit anyone other than Bowen Construction, Mr. Bowen testified that it could benefit their customers who might benefit from reduced prices. When further prompted, Mr. Bowen testified that the shorter the distance the trucks from the rock crusher had to travel, the less dust they would create.

On cross-examination, Appellants elicited testimony from numerous witnesses that asphalt plants were necessary for building roads in a community. They further elicited testimony that the trucks transporting the crushed rock would generate less dust if the distance they needed to travel were shortened.

■ Appellants claim that the evidence presented at trial established that the reasonableness of rezoning the 8.5 acre tract and allowing the relocation the asphalt plant was fairly debatable because "the evidence clearly established that (1) asphalt plants are needed and benefit the community, (2) the current zoning is consistent with the comprehensive plan, (3) the asphalt plant is compatible with the current use of the surrounding property, (4) the approved site plan isolates the asphalt plant, and (5) the location adjacent to the rock-crusher reduces dust."[8] They argue that these public benefits could arguably outweigh Respondents evidence of private detriment.[9]

■ Appellants first contend that the evidence presented at trial established that the rezoning of the property was reasonable because cities need asphalt plants for the public good. But Appellants fail to

8. This quote comes from the first point relied on in the Stampers' brief. The City's point relied on is substantially the same.

9. At the City Council Committee meeting, no evidence was presented that there would be any benefit to the public good in allowing the asphalt plant to relocate. The only argument offered by Bowen Construction for allowing the relocation of the asphalt plant was that it reduced the cost of hauling the virgin rock from the rock crusher to the asphalt plant and that the savings from that cost reduction might be passed on to Bowen Construction's clients, including the city of Kansas City. However, "[w]hen reviewing legislative actions, our scope of review is not limited to the record presented to the legislative body." *Heidrich v. City of Lee's Summit*, 26 S.W.3d 179, 184 (Mo.App. W.D.2000). Accordingly, we review all of the evidence and arguments presented to the trial court in evaluating the reasonableness of the City Council's action, even though that evidence and those arguments were not presented to the City Council for consideration.

indicate how this interest is served by allowing an existing asphalt plant to move approximately one mile. An asphalt plant will be operating in the area regardless of whether the rezoning is granted or not.

Appellants also claim that there is public benefit to rezoning the 8.5–acre lot because the comprehensive plan recommends future zoning of the properties in the area as GP–1. However, Appellants fail to identify what benefit would accrue from placing an 8.5–acre GP–1 (General Industry) zone in the middle of a large area zoned for agricultural and low-density residential use. They also fail to indicate how allowing an asphalt plant, which is not a listed acceptable use for a GP–1 district, would further the goals of the comprehensive plan. In addition, the testimony reflected that the comprehensive plan was a fluid item that was subject to change at any time and that the development in the area had been moving toward residential housing.

Appellants next contend that an asphalt plant is compatible with the use of the land as a quarry and that it is compatible with the agricultural use of the surrounding property because those properties are already subjected to noise from the airport and the rock crusher. In making this argument, Appellants focus solely on the noise aspect of these uses. Their contention that additional noise is compatible with agricultural and low density housing in the area is fundamentally flawed. They fail to indicate how raising the overall level of noise in the area would not hurt the use of this land for agricultural and residential purposes. Moreover, Appellants ignore the evidence presented about the damage to the surrounding property resulting from the sight of the asphalt plant and its smoke, odor, and traffic.

Appellants also assert that the 8.5–acre lot would be more isolated from public roads and neighboring property than the 3.8–acre site. The record does not support the assertion. The aerial photographs and diagrams contained in the record indicate that while the 3.8–acre site is located near a public road, it is surrounded on all sides by property owned by the Stampers on which quarrying activity is also in plain view. The evidence reflects that the new location would be right on the border of the Witt property and would be visible from other properties in the area even if it is not as visible from public roads.

Appellants further argue that allowing the asphalt plant to be relocated would reduce dust produced by the trucks hauling the crushed rock. They point to testimony indicating that the rock hauling trucks would not kick up as much dust if their travel distance were shorter. But the evidence presented at trial did not establish that dust from those trucks taking rock to the 3.8–acre site was a problem in the area, and the aerial photographs reflect that the path traveled by the rock hauling trucks from the rock crusher to the 3.8–acre site fell within the heart of the Stamper property. Accordingly, the Stampers were the most likely to benefit from the reduction of this dust, and no benefit to the public at large was established through this evidence.

Finally, Appellants claim that the traffic issues on Winan Road do not render the City's decision unreasonable because the Stampers were entitled to have a driveway on the property and did not need to rezone the property to have one. This argument ignores the fact that the truck traffic would not be generated by the mere presence of a driveway. Appellants admitted that 75 to 150 trucks would be driving to and from the asphalt plant on a daily

basis to get loaded with asphalt. This traffic would only result if the asphalt plant were operating, and nothing in the record reflects that the mere presence of a paved driveway would generate this type of traffic.

In their briefs, Appellants state that "[w]hether its fairly debatable or not, the correct location of the plant was a policy decision for the legislative body." This statement wholly ignores our standard of review, which requires us to examine "whether the government's evidence establishes that the reasonableness of the zoning is 'fairly debatable.'" *Lenette Realty & Inv. Co.*, 35 S.W.3d at 406. "If a decision bears no substantial relationship to the public health, safety, morals, or general welfare, this Court will consider it arbitrary and unreasonable." *State ex rel. Helujon Ltd.*, 964 S.W.2d at 536. Having reviewed the record and the arguments advanced by the Appellants, we are unable to discern any substantial relationship between the City's decision to allow relocation of the asphalt plant and the public health, safety, morals or general welfare. Appellants failed to present evidence establishing that it was fairly debatable that the public benefit of allowing the asphalt plant to relocate outweighed the private detriment demonstrated by Respondents.

In conclusion, we find that Respondents' evidence established that the private detriment to the surrounding property of allowing the 8.5 acres to be used for an asphalt plant outweighed any public interest in allowing the plant to be relocated. Respondents thereby rebutted the presumed reasonableness of the Ordinance. Appellants then failed to demonstrate that the issue of whether the public interest outweighed the private detriment was fairly debatable. The trial court did not err in finding that, after weighing any benefit to the public against the detriment to the

Respondents' property, the reasonableness of allowing the asphalt plant to be relocated was not fairly debatable and that the City's actions were arbitrary and unreasonable. Point denied.

Our resolution of this issue is dispositive of the appeal. Having determined that the trial court did not err in finding that the City Council acted in an arbitrary and capricious manner in rezoning the 8.5 acres and allowing an asphalt plant to be operated on that property, we need not address the Appellants' argument that the trial court erred in finding that the operation of an asphalt plant was not a permissible use in a GP–1 zone.

The judgment is affirmed.

All concur.